The Law Office of
**CHRISTOPHER J. McGINN**
243 N. Union Street, Suite 220, Lambertville, NJ 08530

tel: 609-683-1900
fax: 800-931-2408

July 15, 2020

Hon. Douglas E. Arpert, U.S.M.J.
U.S. District Court for the District of New Jersey
Clarkson S. Fisher Building and U.S. Courthouse
402 East State Street
Trenton, NJ 08608

> Re:   *Pierre-Charles v. Consumer Portfolio Services, Inc.*
>        Civil Action No. 3:17-cv-10025-BRM-DEA

Dear Judge Arpert:

Along with the Wolf Law Firm, LLC, I represent the Plaintiff and serve as Interim Counsel to the Settlement Class in the above referenced matter. Please accept this letter brief in support of the Plaintiff's application for final approval of the Class Action Settlement.

## I.    Introduction

Plaintiff, Deborah Pierre-Charles, and Defendant, Consumer Portfolio Services, Inc. (CPSI), have agreed to resolve this putative class action involving Plaintiff's claims under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et. seq. ("CFA").

On April 15, 2020, the Court entered an order granting Plaintiff's application that the Court make a front end determination that it would be appropriate to send Notice to the proposed Settlement Class under Rule 23(c)(2)(B); to appoint Plaintiff's Counsel as Interim Counsel to represent the proposed Settlement Class pursuant to Rule 23(g)(3); and to schedule a hearing to determine if the proposed Settlement is fair, reasonable, and adequate pursuant to Rule 23(3)(2).

The Settlement Administrator effectuated the notice plan via three mediums: direct mail, website, and telephone number. Of the 1,141 Notices mailed, the Settlement Administrator determined 1,016 or 89.04% were initially delivered successfully.

In all, approximately 1,141 Settlement Class Members will have approximately $8,000,000 marked as zero balances; approximately 6 persons will have judgments vacated, and approximately $20,500 will be paid to 80 Settlement Class Members, in addition to the credit report benefits. In addition, CPSI will pay for the expenses of the Settlement Administrator, and, subject to Court approval, pay a service award to Plaintiff and the attorney's fees and costs of Class Counsel.

The proposed form of Final Approval Order submitted with this motion has been approved by Defendant's counsel. Defendant's counsel is not a party to this brief and does not necessarily approve of any statement in this brief.

## II. Procedural History

On September 20, 2017, Plaintiff filed her Class Action Complaint in the Superior Court of New Jersey, Mercer vicinage, under Docket No. MER-L-2058-17. On October 30, 2017, Defendant filed a Notice of Removal to remove the case to the District Court of New Jersey. ECF No. 1. On December 7, 2017, Defendant filed a motion for partial dismissal. ECF No. 12. On July 16, 2018, the Court granted Defendant's motion to dismiss Plaintiff's CFA class count. ECF No. 24. As the dismissal was without prejudice, on August 10, 2018, Plaintiff filed her Amended Class Action Complaint in the District of New Jersey. ECF No. 25. On September 7, 2018, Defendant filed its Answer to the Amended Complaint. ECF No. 29.

The Parties engaged in significant discovery. On October 31, 2017, the Magistrate Judge ordered the Joint Discovery Plan Due 7 days prior to the conference. ECF No. 2. On April 2, 2018, the Magistrate Judge entered a Discovery Confidentiality Order. ECF No. 19. On April 26, 2018, the Magistrate Judge ordered the parties to address any discovery disputes. ECF No. 21. Plaintiff served Defendant with two sets of interrogatories, requests for documents, and requests for admission. The parties spent considerable time resolving a number of disputes and attempting to resolve other disputes, including numerous conferences with the Court. McGinn Decl. ¶ 13-15.

On November 15, 2018, Defendant made a motion for summary judgment. ECF No. 36. Plaintiff opposed this motion, and the parties submitted briefings to the court. On May 7, 2019, the Magistrate Judge denied Defendant's motion for summary judgement. ECF No. 48.

In early June, 2019, the parties began negotiating a class action settlement. They engaged in extensive, arms-length negotiations over nine months before the Settlement Agreement was fully executed on March 26, 2020. The amount of attorneys' fees was not negotiated until a settlement principal and framework were reached. McGinn Decl. ¶ 16-18, 20.

On April 15, 2020, the Court entered an Order granting the parties joint application for front end approval of class action settlement to send Notice to the proposed Settlement Class under Rule 23(c)(2)(B); appoint Plaintiff's Counsel as Interim Counsel to represent the proposed Settlement Class pursuant to Rule 23(g)(3); to schedule a hearing; and to make a front end determination that the proposed Settlement is fair, reasonable, and adequate pursuant to Rule 23(e)(2). That Order was amended by consent on April 23, 2020. McGinn Decl. ¶ 4-5.

On May 12, 2020, the Notice was mailed via United States Postal Service First-Class mail to 6 Judgment Class Members, to 80 Payment Class Members and to 1,055 No Payment Class Members. Longley Aff. ¶ 3. Of the 1,141 Notices mailed, the Settlement Administrator determined 1,016 or 89.04% were initially delivered successfully. Longley Aff. ¶ 6.

On June 16, 2020, pursuant to Defendant's obligations regarding confirmatory discovery, Class Counsel received from Defendant's counsel declarations by John A. Nader, counsel for Defendant, Scott Smith, Vice President of Asset Recovery for Defendant, and Chris Terry, Senior Vice President for Risk, Systems, and Information Technology. Over the past two months, Defendant's counsel and Class Counsel had collaborated on the form of these declarations, exchanging draft text and comments. The Terry and Smith Declarations provided a detailed description of the manner by which Defendant sorted data to determine which persons met the

class definition, including the application of the exclusions, as well as how Defendant determined the category for each person within the Settlement. The Nader Declaration described in detail the manner by which Defendant conducted a sampling of personal property storage/release fees assessed by repossession vendors of CPSI and/or repossession subcontractors that conducted repossessions. Mr. Nader's declaration included such information as the persons involved, the sources of information utilized, the manner by which the survey was created, and the results of such survey. McGinn Decl. ¶ 6-8.

The Settlement Agreement, at paragraph 38, includes the following provision:

> CPSI has represented that: (a) it has directed its vendors to not permit the assessment of fees related to storage and release of personal property from vehicles which are involuntarily repossessed; (b) it has included such language in the contracts with its vendors that provide repossession services; (c) its vendors have represented that they will not assess such fees; and (d) it does not charge consumer obligors a fee in addition to a basic repossession fee for the consumer obligor's recovery of personal property from a vehicle involuntarily repossessed. Plaintiff has relied upon these representations, but has agreed that this agreement and these representations do not need to be made part of the Court's Final Approval order. It is understood that these practices will be communicated to the members of the Settlement Class in the proposed form of Class Notice.

On June 4, 2020, Defendant provided a Declaration by Mr. Smith attesting that Defendant had effectuated this requirement. The four Declarations satisfy the confirmatory discovery requirements of the Settlement Agreement. McGinn Decl. ¶ 9-11.

## III.     Summary of Relevant Facts and Plaintiff's Claims

Plaintiff brought a claim CPSI under the Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1 *et seq.* on behalf of herself and others similarly situated related to a personal property release fee charged by Defendant's repossession agents. In Plaintiff's case, a towing agent demanded she pay $95, which it identified as a "Handling Fee," to release the property from her repossessed vehicle. The fee was in addition to the $370 "Flat Rate" repossession fee that Defendant charged her, which Plaintiff asserted included full compensation for the agent's storage and handling of personal property. Plaintiff claimed that the practice of allowing towing agents to demand their own fee for the release of personal property constitutes an unconscionable business practice under the CFA.

## IV.     Summary of the Terms of the Settlement

### A.     Definition of the Proposed Settlement Class

The Settlement Agreement defines the Settlement Class as[1]:

---

[1]     The Settlement Class definition differs from the Settlement class definition in Plaintiff's Amended Complaint. In Plaintiff's Amended Complaint, the class definition was defined as: Any consumer obligor whose motor vehicle was repossessed by CPSI from a location in New Jersey at any time on or after September 20, 2013 and where: A) the collateral vehicle was sold at a location

All consumer obligors whose vehicles were involuntarily repossessed[2] subject to a CPSI security interest in a retail installment sales contract (the "**RISC**") where: (a) according to CPSI's records, the vehicle was involuntarily repossessed in the State of New Jersey; and (b) the vehicle was subsequently disposed of resulting in a deficiency balance (the "**Deficiency Balance**")[3] as reflected on CPSI's records; and (c) where the involuntary repossession occurred after September 19, 2013 and prior to:

(i) November 6, 2017 (if the vehicle was involuntarily repossessed pursuant to a contract between CPSI and American Recovery Service, a Patrick K. Willis Company); or

(ii) February 1, 2018 (if the vehicle was involuntarily repossessed pursuant to a contract between CPSI and ALS Resolvion LLC); or

(iii) February 8, 2018 (if the vehicle was involuntarily repossessed pursuant to a contract between CPSI and any other vendor).

Settlement Agreement at ¶ 1.


**B.    Benefits to the Settlement Class**

The Settlement Class Members will receive different benefits based on the circumstances of the Settlement Class Member's account and CPSI's collection efforts. Settlement Agreement at ¶ 13-21.

For all Settlement Class Members with a Deficiency Balance for which CPSI intended to collect, CPSI will (a) reduce the balance to zero; (b) cease all collection efforts on that account;

---

more than 500 miles from the State of New Jersey in a sale that resulted in a deficiency and not a surplus; or B) the obligor paid a fee to CPSI's repossession agents for the release of property inside the vehicle at the time of repossession. Amended Compl. ¶ 164. After completing partial discovery and engaging in arms-length negotiations with Defendant, the class definition in the Settlement Agreement was broadened to encompass a wider group.

[2]    The term "**involuntarily repossessed**" is defined as taking possession of the vehicle subject to a CPSI security interest without consent of any consumer obligor. However, the term "involuntarily repossessed" shall not be defined as including the recovery of a consumer obligor's vehicle subsequent to the vehicle being impounded, or the recovery of a consumer obligor's vehicle which was subject to a pending insurance claim due to damage to the vehicle. Settlement Agreement, page 2, footnote 1.

[3]    The term "**Deficiency Balance**" is defined as the balance due on the RISC after repossession and disposition of a vehicle, to include prior applicable credits, plus all accrued interest, and other fees and charges assessed by CPSI in accordance with the RISC. Settlement Agreement, page 2, footnote 2.

and (c) not sell that account. Settlement Agreement at ¶ 17. For all Settlement Class Member accounts, CPSI will transmit request to Equifax, Experian, Trans Union and any other consumer credit reporting agency to which it reported, to delete any tradeline reported by CPSI relating to the relevant accounts. Settlement Agreement at ¶ 19.

For those Settlement Class Members whose Deficiency Balance had been satisfied, or with a remaining Deficiency Balance that was marked for no further collections due to a lack of intent of CPSI to pursue collections and which accounts had been removed from collections,[4] CPSI will pay the obligors on the account[5] the sum of $285. Settlement Agreement at ¶ 14. Any Settlement Class Member whose Deficiency Balance is less than the sum of $285, will be paid the difference between $285 and the Deficiency Balance. The payment will be by a check to be mailed directly to the Settlement Class Member by the Settlement Administrator. *Id.*

There shall be only one payment made per RISC account. For accounts with co-obligors, the check will be made jointly payable to all co-obligors. Several days prior to the mailing of any check, the Settlement Administrator will send an email to the recipients (where such emails are available) informing them to expect a check to be mailed. Checks will be sent along with a cover letter from Class Counsel. Settlement Agreement at ¶ 15.

Payments will be made via a check drawn on a bank with at least 20 branches in New Jersey good for 125 days. Settlement Agreement at ¶ 16. Checks must be able to be cashed at the issuing bank without a fee. If an uncashed check expires, a replacement check shall be sent that is good for 45 days from the date it is mailed. Funds from un-cashed checks or otherwise remaining in the settlement account shall be provided as a *cy pres* award to Legal Services of New Jersey (LSNJ) in Edison, New Jersey.[6] *Id.* Class Counsel will deliver the check within 10 days of receipt from the Settlement Administrator along with a copy of the settlement agreement and the final order approving the settlement, and notify Defendant's counsel of the delivery. *Id.*

Regarding those Settlement Class Members against whom CPSI has obtained a judgment after September 1, 2019, CPSI will cause each such judgment to be vacated. Settlement Agreement at ¶ 18. As to those Settlement Class Members against whom CPSI has obtained such a judgment, the Settlement Class Member shall appoint Class Counsel as his or her legal counsel for the limited purpose of acting in coordination with CPSI to obtain vacation of such judgments, which may include the filing of agreed motions or agreed orders to set aside or vacate those judgments. Within 14 days of the entry of an order vacating a judgment, CPSI shall send the order to Class Counsel and to the Settlement Administrator with a request that copies be sent to the relevant Settlement

---

[4]     The phrase "**removed from collections**" specifically includes RISC accounts on which CPSI has no intention to collect a Deficiency Balance from a consumer obligor, or a RISC account for which Deficiency Balance has been deemed satisfied. Settlement Agreement, page 6, footnote 3.

[5]     If any Settlement Class member had more than one repossession during the Settlement Class period that meets the Settlement Class definition, then that person will receive the relevant relief for each such qualifying repossession. Settlement Agreement, page 6, footnote 4.

[6]     Legal Services of New Jersey is a nonprofit organization that provides legal services to economically disadvantaged individuals across the State of New Jersey.

Class Member. The Settlement Administrator shall immediately forward the Order to the appropriate Settlement Class Member. Settlement Agreement at ¶ 18.

In all, approximately 1,141 Settlement Class Members will have approximately $8,000,000 marked as zero balances; approximately 6 persons will have judgments vacated, and approximately $20,500 will be paid to 80 Settlement Class Members, in addition to the credit report benefits. McGinn Decl., ¶ 19.

In conjunction with the agreement in principle as to the scope of the class and the terms of settlement and prior to the actual execution of the Settlement Agreement, the Defendant's counsel represented to me that Defendant had taken steps to cease collection of the accounts of potential class members. However, Class Counsel received information from the Settlement Class indicating that some payments were subsequently received by the Defendant from members of the Settlement Class. Defendant's counsel has represented that Defendant has recently performed an investigation and determined that there were instances where some Settlement Class Member accounts were missed and where Defendants received payments on or after October 1, 2019. Defendant's counsel has represented that upon final approval, Defendant will arrange for those approximately 6-12 persons who made a payment on or after October 1, 2019 to receive a refund of such payments via checks mailed directly. McGinn Decl. ¶ 45-46.

### Settlement Administration

Defendant will pay all costs and expenses associated with administering the Settlement, including but not limited to the fees and expenses of the Settlement Administrator, a website and toll free number created by the Settlement Administrator, communicating with credit bureaus, and implementing the terms of the Settlement. Settlement Agreement at ¶ 25.

### Payment of a Service Award to Plaintiff

Subject to Court approval, the Defendant will pay Plaintiff a Service Award in the amount of $10,000.00, in recognition of her efforts on behalf of the Settlement Class Members in addition to the relief she will receive under the settlement. Settlement Agreement at ¶ 47. The Service Award will be paid by Defendant. *Id.*

### Defendant Will Pay Class Counsel's Fees and Expenses

Defendant agreed to pay Settlement Class Counsel's fees and expenses in the amount of $185,000.00, subject to Court approval. Settlement Agreement at ¶ 49.

## V. Successful Implementation of the Court Approved Notice Plan

In the April 15, 2020 Order the Court found that the direct notice of the Settlement Class Notice in the manner set forth in the Settlement Agreement constituted the best notice practicable under the circumstances, pursuant to Rule 23(c)(2)(B). The Court-appointed Settlement Administrator, Atticus Administration, LLC, has implemented the Notice plan approved by the Court. See Longley Affidavit generally.

On May 5, 2020, Atticus Administration received the initial class Data List from defendant counsel. On May 12, 2020, the Notice was mailed via United States Postal Service First-Class mail to 6 Judgment Class Members, to 80 Payment Class Members and to 1,055 No Payment Class Members. Longley Aff. ¶ 3. Of the 1,141 Notices mailed, the Settlement Administrator determined 1,016 or 89.04% were initially delivered successfully. Longley Aff. ¶ 6.

Seven returned Class Notices had a valid forwarding address information and were promptly re-mailed. A total of 265 undeliverable Notices were sent to a professional address tracing firm to obtain a more current address. Updated addresses were received for 178 Notices and were mailed. For the remaining 87 Class Members, updated addresses could not be found. There were 38 undeliverable Notices received a second time that had been previously traced or returned after the exclusion and objection deadline. Longley Aff. ¶ 6.

The Federal Judicial Center has concluded that a notice plan that reaches at least 70% of the class is reasonable. Federal Judicial Center, *Judges' Class Action Notice & Claims Process Checklist & Plain Language Guide 3 (2010).*

The mailed Notice was supplemented by an informational settlement website, which included key dates for the Settlement, along with easily downloadable Court Documents for Class Members' review. The following text was added to the Notice on the website: "Due to COVID-19 related complications, the final approval hearing may not be open to the public or may be moved to a different date. Updates will be posted here as they become available. Thank you and stay safe." Longley Affidavit ¶ 4. The Settlement Administrator also provided for a toll free 800# for Frequently Asked Questions concerning the Settlement. Longley Affidavit. at ¶ 5.

## VI.    No Settlement Class Member Objected or Requested Exclusion

To date, the Settlement Administrator and Class Counsel have received no requests for exclusion. No objection has been filed or was received by the Settlement Administrator or Class Counsel. Longley Aff. ¶ 7,8. McGinn Decl. ¶ 3.

## VII.   Legal Argument

### A.    The Settlement Satisfies Rule 23(e)(2)

Plaintiff and her counsel have adequately represented the proposed Settlement Class pursuant to Rule 23(e)(2)(A). The Third Circuit has consistently ruled that the measure of adequate representation is dependent upon two factors:

> (a) the plaintiff's attorney must be qualified, experienced and generally able to conduct the proposed litigation; and (b) the plaintiff must not have interests antagonistic to those of the class.

*Weiss v. York Hosp.*, 745 F.2d at 811, (*quoting Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975). In determining the adequacy under Rule 23(a)(4), "[t]he burden is on the defendant to demonstrate that the representation will be inadequate." *Lewis v. Curtis*, 671 F.2d 779, 788 (3d Cir. 1982).

The Third Circuit long has held that the "adequacy-of-representation test is not concerned whether plaintiff personally derived the information pleaded in the complaint or whether he will personally be able to assist his counsel." *Lewis v. Curtis*, 671 F.2d 779, 789 (3d Cir. 1982). Pierre-Charles readily satisfies these standards. She has no conflicting interests, and her and the Settlement Class's claims are based on the same statutory liability theories applied to the same conduct. Plaintiff has no interests antagonistic to the class. McGinn Decl. ¶ 31-32.

Ms. Pierre-Charles' interest is coextensive with the interest of the other members of the class as she and her attorneys "will competently, responsibly and vigorously prosecute the suit, and that the relationship of the representative parties' interests to those of the class are such that there is not likely to be divergence in viewpoint or goals in the conduct of the suit." *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 449 (3d Cir.1977). To satisfy the requirement of coextensive interests, the named plaintiff and putative class members should "share common objectives and legal or factual positions" without "'antagonistic' interests between the representatives and the class." *Gallano v. Running*, 139 N.J. Super. 239, 246 (Ch. Div. 1976) (citing 7A Wright & Miller, Federal Practice and Procedure § 1769).

As shown with respect to typicality, Ms. Pierre-Charles is an adequate Settlement Class representative because she does not have antagonistic interests as her claims are predicated upon the same legal and factual allegations. Plaintiff has and will fairly and adequately represent and protect the interests of the Settlement Class. McGinn Decl., ¶ 31-32.

The Court had appointed Plaintiff's counsel, Andrew R. Wolf, from The Wolf Law Firm and Christopher J. McGinn of The Law Office of Christopher J. McGinn as Interim Counsel pursuant to Fed. R. Civ. P. 23(g)(3). Their significant experience is described in detail below. Given their work in the action; their extensive knowledge of the applicable law; experience with consumer class actions, and the resources that they have and will continue to commit, Interim Class Counsel merit appointment as Class Counsel pursuant to Fed. R. Civ. P. 23(g).

### The Costs, Risks, and Delay of Trial and Appeal

This factor is discussed in the application of the Girsh Factors discussed below.

### Effectiveness of the Proposed Method of Distributing Relief

Settlement Class Members who are eligible will be directly mailed checks without any "claims made" process and drawn on a bank that has a minimum of twenty branches in New Jersey good for 125 days. Settlement Agreement ¶ 16. If a check is returned as undeliverable, the Settlement Administrator will attempt to find a current address. Unclaimed funds from the Settlement Fund will be paid to Legal Services of New Jersey in Edison, New Jersey as a *cy pres* award. *Id.* The Settlement Administrator shall immediately forward any Order vacating a judgment to the appropriate Settlement Class Member. Settlement Agreement at ¶ 18. Likewise, the elimination of deficiency balances and judgments as well as improvements to credit reports will take place without Settlement Class Members having to take any further action. Settlement Agreement at ¶ 17-19.

### The Terms of any Proposed Award of Attorney's Fees

This factor is discussed in the Application of the Girsh Factors discussed below.

### No Other Agreements Made in Connection with the Proposal

Defendant will pay attorneys' fees and costs subject to that agreement are the only agreements made in connection with the proposal. There are no other agreements made in connection with the proposal. McGinn Decl. ¶ 18.

### The Settlement Treats Members Equitably Relative to Each Other

As noted above, the Settlement Class Members will receive different benefits based on the circumstances of the Settlement Class Member's account and CPSI's collection efforts. Settlement Agreement at ¶ 13-21.

### B.    The Settlement Class Satisfies Rule 23(a)

Plaintiff has satisfied each of the four threshold requirements of Rule 23(a) which provides: One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a); *see also Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 140 (3d Cir. 1998); *Prudential II*, 148 F.3d at 308-09. Here, all four elements are satisfied.

Although it is not among Rule 23(a)'s expressly enumerated requirements, the Third Circuit, this Court and others have held that "an essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3), is that the class must be currently and readily ascertainable based on objective criteria." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012). Since the Class is defined based upon objective criteria that are identifiable on the personal property release fees charged by Defendant's repossession agents, their membership is readily ascertainable.

### 1.    The Settlement Class is Sufficiently Numerous

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Although there is no bright-line threshold, the Third Circuit has found that the existence of "more than 90 geographically dispersed Plaintiffs met the numerosity requirement of [Rule] 23(a)(1)." *Eisenberg v. Gagnon*, 766 F.2d 770, 785-86 (3d Cir. 1985). In fact, a class of forty has been presumed to be numerous. *See, e.g., Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001) ("generally if the named plaintiff demonstrates that the potential number of Plaintiff exceeds 40, the first prong of Rule 23(a) has been met"); *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (numerosity is presumed at level of forty class members) (*citing* 1 NEWBERG ON CLASS ACTIONS 2D, (1985 Ed.) § 3.05).

The Settlement Class is comprised of 1,193 persons. This figure well exceeds the threshold for establishing numerosity.

### 2. The Claims of the Settlement Class Raise Common Questions of Law and Fact

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." To satisfy Rule 23(a)(2), a certifiable class-wide claim "must depend upon a common contention," and that "[w]hat matters to class certification is not the raising of common questions—even in droves—but, rather the capacity of a class wide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011).

The Supreme Court and the Third Circuit have long recognized that even one common question (so defined) may demonstrate commonality. *Id.* at 2556 ("We quite agree that for purposes of Rule 23(a)(2) even a single common question will do . . .").

"Commonality" under Rule 23(a)(2) does not require identical claims, and "factual differences among the claims of the putative class members do not defeat certification." *Baby Neal*, 43 F.3d at 56. Instead, "[c]ommonality exists when proposed class members challenge the same conduct of the defendants." *Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 446-47 (E.D. Pa. 2000).

"Common nuclei of fact are typically manifest where…defendants have engaged in standardized conduct towards members of the proposed class by mailing them allegedly illegal form letters or documents." *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). The common nucleus of operative fact is CPSI's practice of demanding their own fee for the release of personal property.

Plaintiff's and Settlement Class members' claims raise the following common question: Whether CPSI violated the CFA by demanding their own fee for the release of personal property. These common questions of law and/or fact have common Class-wide answers that would determine or drive the resolution of Plaintiff's and proposed Settlement Class's claims, and therefore readily satisfy Rule 23(a)(2)'s requirements.

### 3. Plaintiff's Claims are Typical

Rule 23(a)(3) requires that a representative plaintiff's claims be "typical" of those of other class members. The commonality and typicality requirements of Rule 23(a) "tend to merge." *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n.13, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982). The "typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." *Prudential II*, 148 F.3d at 311 (citations omitted). Rule 23(a)(3) is satisfied where a named plaintiff can "show that the issues of law or fact he or she shares in common with the class occupy the same degree of centrality to his or her claims as to those of unnamed class members." *Weiss v. York Hosp.*, 745 F.2d at 809 n.36 (citation omitted).

Ms. Pierre-Charles experience was typical in respect to her interaction with CPSI. Plaintiff asserts class claims based upon CPSI's same actions or failures to act. McGinn Decl. ¶31. Ms. Pierre-Charles's CFA claims thus are typical of the Class's claims.

### 4. Plaintiff and Class Counsel Will Adequately Represent the Settlement Class

The subject of adequacy is discussed above.

### 5. The Settlement Class Satisfies Rule 23(b)(3)

Plaintiff seeks certification of a class under Rule 23(b)(3) for settlement purposes only. The requirements for certifying a Settlement Class under (b)(3) are lessened compared to a litigation class. Since a settlement would eliminate the need for a trial, the Court "need not inquire whether the case, if tried, would present intractable management problems". *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997). Rule 23(b)(3) requires that Court find that:

> the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

The predominance inquiry examines "whether the proposed class is sufficiently cohesive to warrant adjudication by representation". *In re Community Bank of N. Va.*, 418 F.3d 277, 307-308 (3d Cir.2005) (*citing Amchem*, 521 U.S. at 623-24).

Rule 23(b)(3)'s "superiority" requirement asks the Court "to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533-34 (3d Cir. 2004) (citation omitted). In determining superiority, a court may consider the following factors: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability of concentrating the litigation in the particular forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3).

A class action is superior to any other method of proceeding where "there are a potentially large number of class members" with "little interest in 'individually controlling the prosecution or defense of separate actions,' Fed. R. Civ. P. 23(b)(3)(A), because each consumer has a very small claim in relation to the cost of prosecuting a lawsuit." *Warfarin Sodium, supra*, at 534.

As discussed above, the claims brought by Plaintiff are identical to those of the Settlement Class, in that they all involve alleged CFA violations arising out of fee demands for the release of personal property. As such, common questions of law and fact predominate. Superiority is also satisfied as the proposed settlement will provide prompt, predictable, and certain relief, whereas individual litigation would provide no guarantee of relief at all. In addition, it is likely that many Settlement Class members are unaware that they have claims. This Settlement therefore likely represents the only chance for many Settlement Class members to receive any relief at all for these claims.

### C.    Application of the Girsh Factors to the Settlement

The Third Circuit has identified nine factors - the *Girsh* factors - that a district court should consider when determining whether a proposed class action settlement warrants approval. *In re Datatec Systems*, 2007 WL 4225828, *2 (citing *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975). These include:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

The Settlement before the Court in this case satisfies these factors, and, therefore, final approval should be granted.

### 1.    Complexity, Expense and Likely Duration of the Litigation

"The first *Girsh* factor 'captures the probable costs, in both time and money of continued litigation.'" *Sullivan*, 667 F.3d at 320 (*quoting In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 536 (3d Cir. 2004)). There would be significant expense and delay if this litigation were to proceed. The claims would continue to be litigated in Court with virtually no chance of achieving a better result than was obtained in the settlement.

This matter has been litigated for nearly three years. The matter involved Defendant's motions to dismiss and for summary judgment. Had the matter not settled, there likely would have been dispositive motions, followed by trial on any remaining issues. In addition, any judgment could be appealed, thereby further extending the duration of this litigation. Continued litigation would require significant judicial resources and burden the parties, causing them to expend

additional time and expenses. The proposed settlement, on the other hand, removes risk and provides immediate and certain benefits to the Settlement Class.

## 2. The Reaction of the Class to the Settlement

"The second *Girsh* factor 'attempts to gauge whether members of the class support the settlement,' by considering the number of objectors and opt-outs and the substance of any objections." *Sullivan*, 667 F.3d at 321 (*quoting Prudential*, 148 F.3d at 318). To date, no Settlement Class Member requested exclusion or objected. McGinn Decl. ¶ 3.

## 3. Stage of the Proceedings and the Amount of Discovery Completed

"The third *Girsh* factor 'captures the degree of case development that class counsel had accomplished prior to settlement,' and allows the court to 'determine whether counsel had an adequate appreciation of the merits of the case before negotiating.'" *Sullivan*, 667 F.3d at 321 (citations omitted). Essentially, the Court must ensure that the Settlement is not the product of a quick and uninformed decision-making process.

The parties conducted significant discovery in this action. Plaintiff served Defendant with two sets of interrogatories, requests for documents, and requests for admission. The parties spent considerable time resolving a number of disputes and attempting to resolve other disputes, including numerous conferences with the Court. Plaintiff's counsel also conducted significant informal discovery, including examining Defendant's New Jersey Superior Court debt collection cases. McGinn Decl. ¶ 13-15.

As noted above, the matter also involved extensive confirmatory discovery required by the Settlement Agreement with regard to the composition of the class, the accuracy and completeness of the class list, Defendant's change of practices, and the survey conducted by Defendant regarding the charging of certain fees.

Thus, this factor likewise weighs in favor of approval.

## 4. Risks of Establishing Liability

The fourth *Girsh* factor "examine[s] what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them.'" *Sullivan*, 667 F.3d at 322 (quotation omitted).

When evaluating settlement benefits versus the potential award at a trial, the Third Circuit has instructed that the settlement fairness factors must be judged "against the realistic, rather than theoretical, potential for recovery after trial." *Sullivan*, 667 F.3d at 323 (quotation omitted). As the Court is aware, Defendant has denied any violation of the CFA and maintained that their actions were appropriate at all relevant times. If Plaintiff was to reject the settlement reached, in favor of continued litigation, then she might have lost on the merits. As risks are inherent in any litigation, it is also possible that a fact-finder would not rule in favor of the Plaintiff.

While Class Counsel believes the class claims are meritorious, counsel are experienced and realistic, and understand that the resolution of liability issues, trial, and the inevitable appeal process are inherently uncertain in terms of both outcome and duration. Thus, this factor also weighs in favor of approval.

### 5.     The Risk of Establishing Damages

"As with the fourth *Girsh* factor, 'this inquiry attempts to measure the expected value of litigating the action rather than settling it at the current time.'" *Sullivan*, 667 F.3d at 522 (quotation omitted). The Court must determine whether the proposed settlement is within a range that experienced attorneys could accept in light of the relevant risks of the litigation. *GM Truck*, 55 F.3d 768, 806 (3d Cir. 1995).

Here, Plaintiff's class claims were for statutory damages under the CFA. Plaintiff would incur significant risks in proving damages even if she were successful in establishing liability in this matter. Accordingly, this factor weighs heavily in favor of the settlement.

### 6.     Risk of Maintaining the Class Action Through the Trial

After the Supreme Court's opinion in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), this factor may not be significant to a court's determination of the approval of a settlement. *See In re Prudential Ins*., 148 F.3d at 321. Particularly because this is a Settlement Class, this factor adds little to the consideration of the fairness of the Settlement. *In re Safety Components Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 91 (D.N.J. 2001).

As discussed above, this litigation carried significant risks; these risks were higher than the usual high risks associated with class action litigation. One of the issues in discovery was Defendant's claim that the class, as defined by Plaintiff, could not be ascertained by Defendant. McGinn Decl. ¶ 14. It is possible that if the Plaintiff rejected Settlement in favor of pursuing litigation, that the Court would not have certified this matter as a class action. This risk weighs strongly toward settlement.

### 7.     Ability of the Defendants to Withstand Greater Judgment

The seventh *Girsh* factor considers "'whether the defendants could withstand a judgment for an amount significantly greater than the settlement.'" *Sullivan,* 667 F.3d at 323 (*quoting Cendant*, 264 F.3d at 240). The Third Circuit has noted that this fact alone does not weigh against settlement approval. *See, e.g., Warfarin, supra*, 391 F.3d at 538. Where no issue is raised as to whether a defendant can afford larger judgment, this is a neutral factor, weighing neither in favor of nor against the approval of the settlement. *See In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig.,* 263 F.R.D. 226, 242 (E.D. Pa. 2009).

While it is possible that Defendant could be subjected to a greater judgment through further litigation, the settlement benefits are exceedingly generous considering Plaintiff's CFA claim involved a $95 fee. Thus, this factor does not weigh against settlement.

8. **Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation**

"The final two *Girsh* factors consider 'whether the settlement represents a good value for a weak case or a poor value for a strong case.'" *Sullivan*, 667 F.3d at 323 (*quoting Warfarin*, 391 F.3d at 538). "The reasonableness of a proposed settlement is assessed by comparing 'the present value of the damages plaintiffs would likely recover if successful [at trial], appropriately discounted for the risk of not prevailing … with the amount of the proposed settlement.'" *Id.* at 323-24 (*quoting Prudential*, 148 F.3d at 322). The fairness of the settlement process and of the Settlement Agreement itself also was shaped by the experience and reputation of counsel, an important factor in final approval of class action settlements. *See GM Truck*, 55 F.3d at 787-88.

The settlement was not the product of collusive dealings, but rather was the result of extensive arm's-length negotiations by counsel for the parties. McGinn Decl. ¶ 17-18. Furthermore, continued litigation would be long, complex and expensive, and a burden to court dockets. *Lake v. First Nationwide Bank*, 900 F. Supp. 726, 732 (E.D. Pa. 1995) (expense and duration of litigation are factors to be considered in evaluating the reasonableness of a settlement).

The fairness of the Settlement process and of the Settlement Agreement itself also was shaped by the experience of counsel, an important factor in final approval of class action settlements. *See General Motors*, 55 F.3d at 787-88; *Fisher Brothers v. Phelps Dodge Industries, Inc.*, 604 F. Supp. 446, 452 (E.D. Pa. 1985) ("The professional judgment of counsel involved in the litigation is entitled to significant weight.").

The Settlement does not unduly grant preferential treatment to any segment of the Settlement Class. Due to the nature of the Settlement Agreement, Class Members of the Settlement Class receive a different type of relief based on their personal circumstances and status in regards to the matter. The Settlement Agreement defines three categories of Class Members; 1) those Class Members with a Deficiency Balance that CPSI intended to collect; 2) those Class Members with a Deficiency Balance that was satisfied; and 3) those Settlement Class Members that CPSI had obtained a judgment against. The relief for each Settlement Class was tailored appropriately to the circumstances of the Settlement Class Member's account, providing a monetary award, wiping out of debt on the account, or a hybrid of these forms of relief. No Class Member was afforded special relief or a different quality of relief; rather, relief was based upon the status of the Class Member's account.

In all, In all, approximately 1,141 Settlement Class Members will have approximately $8,000,000 marked as zero balances; approximately 6 persons will have judgments vacated, and approximately $20,500 will be paid to 80 persons, in addition to the credit report benefits. McGinn Decl. ¶ 19.

D. **The Award to the Named Plaintiff is Appropriate and Merits Approval**

Service award payments to named class representatives are commonly approved by courts in class action settlements. *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 958 (9th Cir. 2009) ("Incentive awards are fairly typical in class action cases. Such awards are discretionary and are intended to compensate class representatives for work done on behalf of the class.") (internal

citations omitted); *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 118 (E.D. Pa. 2005) (reviewing cases in which Courts approved service awards in settlement to named class action plaintiffs).

In approving a service award to named class action plaintiffs, the New Jersey Appellate Division in *Machulsky v. Lilliston Ford*, 2008 WL 2788073, No. A-2987-06T5 (App. Div. July 21, 2008), conducted a thorough review of applicable federal case law and found that "[i]ncentive awards to class representatives in class actions are a recognized element of agreements to resolve class actions." *Id.* at *2-3 (*citing In Re Compact Disc Minimum Advertised Price Antitrust Litigation*, 292 F. Supp. 2d 184, 189 (D. Me. 2003); *Lachance v. Harrington*, 965 F. Supp. 630, 652 (E.D. Pa. 1997); *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 535 (E.D. Pa. 1990); *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001). The *Machulsky* court restated the factors commonly considered by courts when determining whether to approve a service award to class action plaintiffs:

> 1) the risk to the class representative in commencing suit, both financial and otherwise;
> 2) the notoriety and personal difficulties encountered by the class representative;
> 3) the amount of time and effort spent by the class representative;
> 4) the duration of the litigation; and
> 5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.

*Id.* at *3 (*quoting Van Vraken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995)). Among other "valid reasons" for approving awards to the class representative, the *Machulsky* court noted that "the public policy favoring private civil litigation as a means to promote certain important social values often fails to provide adequate compensation or incentive for plaintiffs to take on this burden simply on principle." *Id.* at *3 (*quoting* Clinton A. Krislov, Scrutiny of the Bounty: Incentive Awards for Plaintiffs in Class Litigation, 78 Ill. B.J. 286 (1990)).

One organization has described the purpose behind service award payments to named class action plaintiffs as follows:

> Awards to named plaintiffs are appropriate in recognition of their willingness to undertake the representation of class members. Consumers who represent an entire class should be compensated reasonably when their efforts are successful and compensation would not present a conflict of interest. The amount that is reasonable depends on the circumstances of the case…

National Association of Consumer Advocates, *Standards and Guidelines for Litigating and Settling Consumer Class Actions*, Guideline 5, paragraph C (2014).

While not all courts have uniformly approved of incentive payments, it is clear that "whether to grant incentive awards is entirely within the trial court's discretion." *Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 408 (7th Cir. 2000), *cert. denied*, 532 U.S. 1038, 121 S. Ct.

2000, 149 L. Ed. 2d 1003 (2001). There is "ample authority in this and other circuits for the approval of incentive awards." *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 257 (D.N.J. 2005) (collecting cases). "Like the attorneys in this case, the class representatives here have conferred benefits on all other class members and they deserve to be compensated accordingly." *Id.* at 258 (*quoting In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. LEXIS 10532, at *56 (E.D. Pa. June 2, 2004).

Here, as in other cases where incentive awards have been permitted, the named Plaintiff took action which "protected the interests of the Class Members and which have resulted in a Settlement that provides substantial economic and non-economic benefits for the Class Members." *Enter. Energy Corp. v. Columbia Gas Transmission Corp.,* 137 F.R.D. 240, 251 (S.D. Ohio 1991). Plaintiff participated in the drafting of the pleadings and the litigation process, including discovery.

It is highly unlikely that this litigation would have continued for as long as it has if the case proceeded on an individual basis. If this settlement is not approved and the matter is eventually litigated, she would need to participate in further discovery and testify at trial if necessary.

The subject matter of this case is about the Defendant's efforts to demand their own fee for the release of personal property. Plaintiff's name is associated with this case in both the Court's records and in the notice to the settlement class. This type of notoriety is not too dissimilar to the named Plaintiffs in *Haas v. Burlington Cty.*, No. CV 08-1102 (NLH/JS), 2019 WL 413530, at *5 n.4 (D.N.J. Jan. 31, 2019). In that case the settlement provided for incentive awards of $50,000 and $30,000 for the two named plaintiffs, in a case involving civil rights claims related to strip-searching conducted at county correctional facilities. The settlement provided for up to $400 per class member. In approving the awards as reasonable over an objection as to the lack of proportionality with the recovery of individual class members, the court noted that, as here, the awards did not reduce the compensation available to the other class members. *Haas* at 11.

The Settlement Agreement provides that Defendant will pay Plaintiff $10,000.00, in recognition of her efforts on behalf of the Settlement Class Members in addition to the relief she will receive under the settlement. Settlement Agreement at ¶ 47. The $10,000.00 service award to Plaintiff is well within the range of incentive awards approved by Court in Class Actions. *See In re Ins. Brokerage Antitrust Litig.,* 579 F.3d 241, 285 (3d Cir.2009) (finding that the court did not err in granting final approval of a settlement that included $150,000 in incentive awards distributed between fifteen named plaintiffs); *Bogosian v. Gulf Oil Corp.,* 621 F.Supp. 27, 32 (E.D.Pa.1985) (granting incentive awards of $20,000 to each class representative).; *Dewey v. Volkswagen of Am.,* 728 F. Supp. 2d 546, 577-78 (D.N.J. 2010), *rev'd and remanded on other grounds Dewey v. Volkswagen Aktiengesellschaft,* 681 F.3d 170 (3d Cir. 2012)(approving incentive awards of $10,000 each to nine named Plaintiffs when the awards were agreed to and did not diminish the class recovery); *Varacello v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 258–29 (D.N.J.2005) (incentive awards ranging from $1,000 to $10,000); *Hegab v. Family Dollar Stores, Inc.*, No. 11-cv-01206, 2015 WL 1021130, at *16 (D.N.J. Mar. 9, 2015) (named plaintiff received a $7,500 enhancement award); *Gunthert v. Bankers Standard Insurance Company*, No. 5:16-CV-00021, 2019 WL 1103408, at *7 (M.D. Ga. Mar. 8, 2019) (finding that a $10,000 service award fair and reasonable); P. Notice of Mot. And Mot. for an Order Granting Final Approval of Class Action Settlement, Ex. B at *2, *Javier Camacho v. Southwest Harvesting, Inc.*, 16-CV-05744-LHK (N.D. Cal. Jan. 18, 2018) (granting a $7,500 service award); Fin. Order and J., 7, *Marcum and Lewis et*

*al. v. Dolgen Corp. Inc.,* No.: 3:12cv108, (E.D. Va. Mar. 4, 2015) (granting two $10,000 incentive awards); *Brulee v. DAL Global Serv., LLC*, 2018 WL 6616659 at *2, (C.D. Cal. Dec. 13, 2018) ($10,000 service award to each named plaintiff); Order Grant. Mot. for Prelim. Approval, 13, *Champagne v. Plannernet, Inc.*, No.: 17-cv-02128-SK (N.D. Cal. Apr. 22, 2019).

A comprehensive academic study of class action incentive awards conducted in 2006 found that the average award was $15,991.54. Eisenberg & Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. REV. 1303, 1321 (2006).

### E. Class Counsel's Application for Attorneys' Fees and Costs is Reasonable and Should be Approved

Class Counsel, having created and negotiated this comprehensive settlement, seek an award of attorney's fees and costs. The fee award sought by Class Counsel includes all time spent to date and going forward. Class Counsel will not be making a separate fee petition for additional time and expenses going forward, including participation in the final approval hearing, answering class member questions, and the general monitoring and enforcement of the settlement, including the process of vacating judgments.

In fee-shifting cases, the Supreme Court has held that the "most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. In *Rendine v. Pantzer*, 141 N.J. 292, 334-35 (1995), the Court set forth the procedure to be used by the trial court in determining the fee award. First, the attorney should set forth the billable hours in sufficient detail to permit the trial court to ascertain the manner in which the billable hours were divided among the various counsel and various general activities. *Rendine*, 141 N.J. at 335. A reasonable hourly rate is calculated according to the prevailing market rates in the relevant community for counsel of similar skill, experience, and reputation. *Id.* at 337. Hourly rates should be fair, realistic and accurate. *Id.* at 337. To take into account delay in payment, the hourly rate should be based on current rates rather than those in effect when the services were performed. *Ibid.*

Prevailing parties may also collect reasonable attorney's fees for the time spent preparing the fee petition itself. *See R.M. v. Supreme Court of New Jersey*, 190 N.J. 1, 14 (2007); *Institutionalized Juveniles v. Secretary of Pub. Welfare*, 758 F.2d 897, 924-25 (3d. Cir. 1985).

The lodestar and expenses of Class Counsel in this matter is as follows: The Wolf Law Firm, LLC has spent 108.3 hours on this matter, with a lodestar of $67,614 at current rates, costs and expenses equal to $439.88 for a total of $68,097.88. Wolf Cert. ¶ 26 and Exhibit C. The Law Office of Christopher J. McGinn spent 212.7 hours on this case, with a lodestar of $110,604 and expenses in the amount of $133.45. McGinn Cert. ¶ 39-40 and Exhibit A.

Class Counsel's total combined lodestar is $178,218, the sum of their costs is $617.33, for a total combined fees and costs to date is $178.835.33.

This amount does not include the time moving forward including: preparing for and attending the Fairness Hearing; overseeing the implementation of the settlement, including the mailing of checks, communications with credit bureaus, and the vacating of judgments; responding to Settlement Class Member inquiries; communications with the Settlement Administrator;

ensuring the mechanism for sending and re-sending checks; and facilitating the delivery of the *cy pres* award check. Class Counsel estimate that the lodestar anticipated work moving forward will be approximately $12,000. McGinn Cert. ¶39.

Defendants have agreed to pay, and Class Counsel have agreed to accept, the sum of $185,000. When taking into account the anticipated time moving forwarded, the award is actually less than the total fees and costs of Class Counsel.

Were the Court to not consider the time and expenses moving forward, the award represents only $6,164.67 more than the combined fees and costs to date.

After establishing the lodestar fee, the Court should consider whether to increase that fee to reflect the risk of nonpayment. *Rendine*, 141 N.J. at 338. The New Jersey Supreme Court stated that the contingency enhancement rests on the desire to enable parties to compete for legal services in the private market:

> In that market, parties who can offer only fee awards contend with parties who can offer certain hourly payments and with parties who can offer contingent percentage fees from damage awards. To bid for services effectively, parties with only fee awards to offer must be able to pay market rates. They cannot do that when they are denied contingency enhancements because they cannot cover the nonpayment risk. A lawyer given a choice between an un-enhanced hourly rate in a fee award case and an equal rate in a case where payment is certain will have a strong incentive to decline the fee award case.

*Id.* at 339.

The Court concluded that, as a matter of economic reality and simple fairness, a counsel fee awarded under a fee-shifting statute may not be "reasonable" unless the lodestar, calculated as if the attorney's compensation were guaranteed irrespective of result, is adjusted to reflect the actual risk that the attorney will not receive payment if the suit does not succeed. *Id.* at 338. The *Rendine* Court explained this reasoning by quoting *Cherner v. Transitron Elec. Corp.*, 221 F. Supp. 55, 62 (D. Mass. 1963):

> No one expects a lawyer to give his services at bargain rates in a civil matter on behalf of a client who is not impecunious. No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success.

141 N.J. at 339. In addition, "[l]awyers operating in the marketplace can be expected to charge a higher hourly rate when their compensation is contingent on success than when they will be promptly paid, irrespective of whether they win or lose." *Rendine*, 141 N.J. at 338, *quoting Blum v. Stenson*, 465 U.S. 886, 903 (1984) (Brennan, J., concurring). As the New Jersey Supreme Court observed, "there is no such thing as a market hourly rate in contingent litigation." *Rendine*, 141 N.J. at 342 (internal quotation omitted).

The economic theory behind the awarding of fee enhancements in contingency cases has been explained by Judge Posner:

A contingent fee must be higher than a fee for the same legal services paid as they are performed. The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services. The implicit interest rate on such a loan is higher because the risk of default (the loss of the case, which cancels the debt of the client to the lawyer) is much higher than that of conventional loans."

Posner, Economic Analysis of Law 534, 567 (4th ed. 1992). *See also* Leubsdorf, *The Contingency Factor in Attorney Fee Awards*, 90 Yale L.J. 473, 480-501 (1981) ("A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions. If he is paid no more, competent counsel will be reluctant to accept fee award cases . . . . [M]ost lawyers of this quality do seem to consider the prospects of success before adding to their crowded calendars a case in which payment is contingent.")

In *Walker v. Giuffre*, 209 N.J. 124 (2012), the New Jersey Supreme Court reaffirmed the rules it had set forth in *Rendine* governing contingency fee enhancements. *Id.* at 129. The Court specifically rejected the argument that the decision by the United States Supreme Court in *Perdue v. Kenny*, 559 U.S. 542, 130 S. Ct. 1662, 176 L. Ed. 2d 494 (2010), had "altered in any way" the framework established under *Rendine* for evaluating attorneys' fees awards. *Id.* at 148. The *Walker* Court reaffirmed the "ordinary range for a contingency enhancement as being between five and fifty percent," as well as "the typical range as being between twenty and thirty-five percent of the lodestar." *Id.* at 148 (*citing Rendine*, 141 N.J. at 332). In so doing, courts should "determine whether a case was taken on a contingent basis, whether the attorney was able to mitigate the risk of nonpayment in any way, and whether other economic risks were aggravated by the contingency of payment." *Id.* at 139 (*quoting Rendine*, 141 N.J. at 339).

This case was purely contingent, and Class Counsel faced a significant risk of nonpayment. Plaintiffs' attorneys have not been paid for any of their work and expenses to date, and counsel have been unable to mitigate the risk of non-payment in any way. Class Counsel thus requests that the Court in its discretion award a very modest enhancement. Such an enhancement would be eminently reasonable, particularly given that *Rendine*—which was not even a class action—also recognized that larger contingency fee enhancements of 100% are appropriate in certain cases. 141 N.J. at 343. In addition, it is worth noting federal courts have routinely awarded multipliers in consumer class actions of up to 400% of the lodestar or even higher. *See, e.g.*, *In re Prudential Ins. Co. of America Sales Practices Litig.*, 148 F.3d 283, 341 (3d Cir. 1998) (multipliers ranging from 1.0 to 4.0 have often been awarded); *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 256 (D.N.J. 2005) (2.83 multiplier approved); *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 311 (E.D. Pa. 2003) (in settlement involving discount certificates off the price of a scheduled auto maintenance service, multiplier was between 2.95 and 6.08, and "[n]either figure seems unreasonable"). The approximately $6,164.67 difference would constitute a multiplier of 0.03459, a miniscule fraction of the "typical" range identified by *Rendine*.

Taking into account the necessary time moving forward, the $185,000 award would be less than the total fees and expenses of Class Counsel given the significant time necessary moving forward.

In support of this petition, Class Counsel have submitted detailed time records specifying the date of work performed, the attorney performing the work, the nature of the work, the amount of time spent and the hourly rate charged for the tasks. Wolf Decl. at ¶ 26 and Ex. C; McGinn Decl. at ¶ 39 and Ex. A. These submissions readily satisfy this Circuit's requirement of the degree of specificity required of a party seeking attorneys' fees. *See Rode v. Dellarciprete*, 892 F.2d 1177, 1190 (3d Cir. 1990) (specificity required to extent necessary to determine if the hours claimed are unreasonable for the work performed). There was no time for which compensation is requested in this case that was "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434.

Class Counsel's certifications reveal that each attorney's hourly rates have been approved by multiple judges in several different jurisdictions. Wolf Cert. ¶ 34-40; McGinn Decl. ¶ 41-44. Furthermore, in April of 2020, Bruce D. Greenberg, Esq., of Lite DePalma Greenberg, LLC reviewed Class Counsel's biographies and current hourly rates and prepared an expert certification for another matter where he has found Class Counsels' current rates to be reasonable. See Wolf Cert. ¶ 40, Ex. D. (Greenberg Certification). *See also*: Wolf Decl. ¶ 41-45, Exs. E-L.

### 4.      The Attorneys' Fees Award is Consistent with the RPCs

Applications for attorneys' fees "shall be supported by an affidavit addressing pertinent factors, including those in [Rule of Professional Conduct] 1.5(a), and shall include amount of fees and disbursements sought." *Furst*, *supra* at 21 (citing R. 4:42-9(b)). The factors set forth in R.P.C. 1.5 (a) should inform the Court in determining whether the fees sought are indeed reasonable.

#### a.      R.P.C. 1.5(a)(1) - "the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly"

In addressing "time and labor required", the Court should examine "the aggregate hours" expended on the case "as a whole," not the hours spent on particular case events. *Rendine*, *supra*, 141 N.J. at 335, 336. The *Rendine* court emphasized that "[i]t is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted." *Rendine*, *supra*, 141 N.J. at 337. Indeed, at least one court has recognized that a class action generally results in the accumulation of a significant number of work hours. *Davis v. Riddle Associates, P.C.*, 579 F.Supp.2d 692, 695 (E.D.Pa. 2008) As demonstrated by the attached Certifications and time records, Class Counsel has invested 321 hours of attorney time to date in a case that was filed in September 2017, and involved extensive discovery and motion practice.

#### b.      R.P.C. 1.5(a)(2) –"the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer"

Class Counsel's commitment to this action caused Class Counsel to forgo other work; if Class Counsel had not taken this case, they could have probably litigated or settled another class action or several individual cases instead. Class action litigation is a specialty that requires a significant outlay of time, human resources, and money in order to properly serve the clients and the putative class. While this was not the only matter being handled by The Wolf Law Firm, LLC

and The Law Office of Christopher J. McGinn at any one time, the time spent by Class Counsel during the years that this case has been litigated could have, and would have, been spent on other matters.  Wolf Decl. at ¶ 9-10, McGinn Decl. at ¶ 28.

Class Counsel enjoyed no guarantee of success when they filed this action. Class Counsel have not been paid for the fees and costs sought.  Many lawyers would not even have considered taking on these cases, let alone a class action of this nature because of the time demands, the expenses that would have to be advanced, the risks outlined above and the deferral of payment inherent in contingent cases.  Wolf Decl. at ¶ 9-10.

### c.  R.P.C. 1.5(a)(3) - "the fee customarily charged in the locality for similar legal services"

The hourly rates referenced in Class Counsels' application are the current rates since "[t]o take into account delay in payment, the hourly rate at which compensation is to be awarded should be based on current rates rather than those in effect when the services were performed." *Rendine*, *supra*, 141 N.J. at 337; see also, *R.M. v. Supreme Court*, 190 N.J. 1, 10 (2007).

The current hourly rates for Class Counsel are well within the range of rates charged by attorneys with comparable experience levels for consumer litigation of a similar nature of what is reasonable and appropriate in this market. Class Counsel's Certifications supports their current hourly rates, which have been approved in multiple cases in several different jurisdictions. See Wolf Cert., ¶ 37-39; McGinn Decl., ¶ 41-44.  In April of 2020,  Bruce D. Greenberg, Esq., of Lite DePalma Greenberg, LLC reviewed Class Counsel's biographies and current hourly rates and prepared an expert certification for another matter where he has found Class Counsels' current rates to be reasonable. See Wolf Cert. ¶ 40, Ex. D. (Greenberg Certification).  *See also*: Wolf Decl. ¶ 41-45, Exs. E-L.

### d.  R.P.C. 1.5(a)(4) "amount...and results obtained"

In all, approximately 1,141 Settlement Class Members will have approximately $8,000,000 marked as zero balances; approximately 6 persons will have judgments vacated, and approximately $20,500 will be paid to 80 persons, in addition to the credit report benefits. In light of this significant and extensive relief, Class Counsel should be granted the requested award, because those fees and costs are entirely reasonable given the attorney time and resources which were necessarily incurred to prepare, litigate, and ultimately resolve this matter.

### e.  R.P.C. 1.5(a)(5) – "the time limitations imposed by the client or by the circumstances"

Class Counsel had to deal with time limitations and constraints, including preparing and filing the initial pleading, submitting a joint discovery plan, motions to dismiss and for summary judgment, discovery, conferences, finalizing the settlement agreement, class notice, and proposed forms of orders, collaborating on confirmatory discovery, and filing the applications for preliminary and final approval.  McGinn Decl., ¶ 6-18.

### f. R.P.C. 1.5(a)(6) – "the nature and length of the professional relationship with the client"

Class Counsel has had a professional relationship with Plaintiff for the entirety of this litigation. Mr. Wolf has known the Plaintiff in a professional context prior to her representation. Plaintiff actively participated in the class action lawsuit, for nearly three years of litigation and settlement negotiations. She aided Class Counsel in drafting the Complaint and was kept informed of the litigation throughout its entire course. If this Settlement is not Plaintiff is prepared to – if necessary – appear for depositions and attend trial. Wolf Decl. at ¶ 14. The time spent by Class Counsel litigating this matter was reasonably spent and, despite the risks involved, Class Counsel persevered until an excellent result was achieved for the Settlement Class.

### g. R.P.C. 1.5(a)(7) - "the experience, reputation and ability of the lawyer or lawyers performing the services"

Class Counsel are highly experienced in the area of consumer law and class action practice.

Mr. Wolf's was first admitted to the New Jersey Bar in 1995 and opened his own practice in 1997. He is the recipient of the Middlesex County Bar Association's 2018 Robert J. Cirafesi Chancery Practice Award and the Legal Services of New Jersey's 2010 Debevoise-Eakeley Award in recognition of his "unparalleled support for Legal Services". Wolf Decl. Ex. A. He was named as a "New Jersey Super Lawyer" from 2014-2018. Mr. Wolf serves as a Board Member of the Consumers League of New Jersey and is a member of the National Association of Consumer Advocates. Wolf Decl. at ¶ 15-19.

Mr. Wolf has taught consumer protection law to legal services attorneys on behalf of Legal Services of New Jersey (2002, 2003, and 2007-2018). Since 2013 he has been employed as an adjunct professor at Rutgers University School of Law – Newark to teach a skills and methods course on consumer protection litigation to second and third year law students. Wolf Decl. at ¶ 20-21. Mr. Wolf's has been involved in numerous published consumer law decisions. Wolf Decl. at ¶ 18. His experiences is described in detail in his Declaration at ¶ 15-23 and Exhibits A and B.

Mr. McGinn is in his twentieth year practicing law. For eight years prior to attending law school, he worked for Public Citizen, a national consumer organization founded by Ralph Nader, where he served as an advocate for consumers on banking and international trade issues. McGinn Cert., ¶ 34. He is a member of the New Jersey State Bar Association and its Special Committee on Consumer Protection Law, the National Association of Consumer Advocates and the National Consumer Law Center. He serves as a volunteer attorney for Volunteer Lawyers for Justice and for the Military Legal Assistance Program of the New Jersey Bar Association. Mr. McGinn serves as an advisor and trainer to consumer attorneys employed by Legal Services of New Jersey. McGinn Cert., ¶ 35-36. Mr. McGinn has been certified as class counsel in 55 matters, including cases against car dealers for consumer fraud, financial institutions for improperly disposing of repossessed vehicles, debt collectors for deceptive practices, and Verizon for overcharging small businesses. See McGinn Cert., ¶ 37-38.

This factor is well satisfied.

### h. R.P.C. 1.5(a)(8) - "fee is fixed or contingent"

This matter was taken upon a complete contingency fee arrangement. Class Counsel therefore took the substantial risk of not getting paid at all if the case was not successful. Moreover, by taking on this matter, which required a significant amount of litigation and negotiations over the course of more than one year before it resolved, Class Counsel was also prevented from doing other work on other cases, for which they could have been paid. Wolf Decl. at ¶ 30-31, McGinn Decl. at ¶ 28.

## VIII. Conclusion

For the foregoing reasons, Plaintiff respectfully requests that the Court grant final approval to the Class Action Settlement and enter the proposed form of Order.

Respectfully Submitted,

Dated: July 15, 2020

/s Christopher J. McGinn, Esq.
Law Office of Christopher J. McGinn
cjmcginn@njconsumerprotection.com
Attorney for Plaintiff